# EXHIBIT 2

<u>**DEMAND FOR ARBITRATION**</u>

Claimants Cynthia Kobel ("Kobel") and Shalanda Houston ("Houston"), collectively "Claimants", file this Demand for Arbitration ("Demand") against JPay, Inc. ("Respondent" or "JPay"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.    INTRODUCTION

1.    Family members or friends of prison inmates often need to send money to prisoners to pay for basic needs such as toothpaste, toilet paper, visits to the doctor, and winter clothes. In some states, families of inmates pay for electricity and even room and board, as governments increasingly shift the costs of imprisonment from taxpayers to the families of inmates.

2.    Historically, family members and friends of inmates would send a paper money order to the prison or jail—for nothing more than the cost of a stamp and the value of the money order.

3.    But in the last decade, JPay has taken control of money transfers in 70% of prison systems in the United States.  Today, some 1.7 million inmates and their friends and families are captive to JPay, which is their sole or primary means of money transfer—for an outrageous ransom.  These exorbitant electronic money transfer fees fall, in large part, on the shoulders of families already struggling to survive in the absence of a jailed family member.

4.    Now, rather than paying for the cost of a stamp to send an inmate $20, JPay charges family members and friends a fee as high as *45 percent of the amount transferred*.

5.    As part of its aggressive push to control all money transfer for a given prison

system, JPay also eliminates or controls the one remaining free or inexpensive method for money transfers—paper money orders.  Once JPay takes control over the means of transferring money orders at a prison or jail, JPay intentionally makes it unnecessarily difficult and burdensome for people to use paper money orders to send money to a prisoner.  Worse, JPay intentionally slows down paper money order processing in order to force family members and friends to use JPay's expensive electronic money transfer services if they want to deliver money to the inmate in anything approaching a timely fashion.

6.     Complaints from around the country indicate that when JPay takes over money transfer services at a given prison, paper money order processing times increase exponentially— and now regularly exceed thirty days.  Such delays are intolerable for family members who need to get funds to prisoners for often-urgent needs.

7.     JPay never informs users of its money transfer services that significant portions of its exorbitant money transfer fees are not for services rendered, but are rather used to pay kickbacks or "commissions" to the prison officials and departments that run the prisons.  In Illinois, for example, JPay pays the Department of Corrections 50 cents out of every money transfer fee paid by a friend or family member of an inmate—but it never discloses this fact to users of its services.  Similarly, in Louisiana, JPay pays the Department of Corrections 15% of every money transfer fee paid by an inmate's family or friend—but does not inform its users of this kickback.

8.     In 2013, JPay handled seven million transfers amounting to approximately one billion dollars of prisoner funds, generating well over $50 million in fee revenue from prisoners' families and friends.

9.     JPay uses four tactics to make sure that Claimants and members of the Class did

not and could not choose to use money transfer services other than it expensive, electronic service.  ***First***, JPay makes the free money order option difficult to use. ***Second***, JPay makes deceptive marketing representations that exploit the difficulty and slowness of free money order transfers—*even though such difficulty and slowness are both of its own making*—without ever adequately informing consumers that a free money order option exists. ***Third***, JPay intentionally slows down access to money transferred with free money orders in order to force consumers to use its expensive electronic transfer services.  ***Finally***, JPay never informs consumers that the "service fee" it charges for electronic transfers is used, in part, to pay commissions to prison officials.

## II.    PARTIES

10.    Cynthia Kobel is a citizen of Michigan and resides in Harbert, Michigan. Ms. Kobel made electronic money transfers through JPay to inmates at Illinois prisons.

11.    Shalanda Houston is a citizen of Georgia and resides in Atlanta, Georgia. Ms. Houston made electronic money transfers through JPay to an inmate at Louisiana Correctional Facilities.

12.    JPay, Inc. is a provider of corrections-related services in more than thirty states across the country, as well as a provider of a payment options for individuals in community corrections.  JPay maintains its headquarters in Miami, Florida.

## III.    FACTUAL ALLEGATIONS

### A.    JPay Assesses Exorbitant Transfer Fees And Uses a Substantial Portion of Those Fees to Pay Undisclosed Kickbacks to Corrections Departments.

13.    Out of every electronic money transfer fee a consumer pays, JPay sends at least 50 cents to the prison operator or corrections department in the form of an "incentive payment" or kickback.  The "incentive" is for the prison officials to provide JPay unfettered access to its

captive prison population, and to allow JPay to exploit this powerless group of people—without competition or scrutiny.

14. JPay assesses electronic money transfer fees of up to 45% per transfer.

15. In Illinois, those fees are as follows:

## Stateville Correctional Center

Illinois Department of Corrections

Get Driving Directions

**Available JPay Services**

Send Money Rates

Rates

| Online | | | |
|---|---|---|---|
| $ 0.00 | - | 20.00 | $4.95 |
| $ 20.01 | - | 100.00 | $7.95 |
| $ 100.01 | - | 200.00 | $9.95 |
| $ 200.01 | - | 300.00 | $11.95 |
| **By Phone** | | | |
| $ 0.00 | - | 20.00 | $5.95 |
| $ 20.01 | - | 100.00 | $8.95 |
| $ 100.01 | - | 200.00 | $10.95 |
| $ 200.01 | - | 300.00 | $12.95 |

Delivery Timing**

| If you send money on | Inmate can spend on |
|---|---|
| Before 10:00 PM CST Thursday | Friday |
| Before 10:00 PM CST Friday | Saturday |
| Before 10:00 PM CST Monday | Tuesday |
| Before 10:00 PM CST Tuesday | Wedn... |
| Before 10:00 PM CST Wedn... | Thursday |
| Before 10:00 PM CST Saturday | Sunday |
| Before 10:00 PM CST Sunday | Monday |

**Please note, payment availability is subject to depositor validation in accordance with federal and state regulations.

## Menard Correctional Center

Illinois Department of Corrections

Get Driving Directions

**Available JPay Services**

Send Money Rates

Rates

| Online | | | |
|---|---|---|---|
| $ 0.00 | - | 20.00 | $4.95 |
| $ 20.01 | - | 100.00 | $7.95 |
| $ 100.01 | - | 200.00 | $9.95 |
| $ 200.01 | - | 300.00 | $11.95 |
| **By Phone** | | | |
| $ 0.00 | - | 20.00 | $5.95 |
| $ 20.01 | - | 100.00 | $8.95 |
| $ 100.01 | - | 200.00 | $10.95 |
| $ 200.01 | - | 300.00 | $12.95 |

Delivery Timing**

| If you send money on | Inmate can spend on |
|---|---|
| Before 10:00 PM CST Thursday | Friday |
| Before 10:00 PM CST Friday | Saturday |
| Before 10:00 PM CST Monday | Tuesday |
| Before 10:00 PM CST Tuesday | Wedn... |
| Before 10:00 PM CST Wedn... | Thursday |
| Before 10:00 PM CST Saturday | Sunday |
| Before 10:00 PM CST Sunday | Monday |

**Please note, payment availability is subject to depositor validation in accordance with federal and state regulations.

16. In Louisiana, those fees are as follows:



17.     JPay sets its electronic money transfer fees, depending on the amount of the transfer, to include the kickbacks. Ms. Kobel and Ms. Houston, therefore, paid the amount of the commissions and were not reimbursed for them.

18.     JPay promises such commissions to the prison operators in order to win exclusive contracts to provide money transfer services to inmates and ensure a captive population for its electronic money transfer services.

19.     According to the contract between JPay and the Illinois Department of Corrections ("IL DOC"), for example, "The vendor [JPay] will charge the sender for the services rendered, with an incentive payment to the Agencies for the transactions…JPay will pay $0.50 per deposit to the Agency as an incentive payment."

20.     As the plain terms of JPay's contract with the State of Illinois indicates, JPay is

only authorized to charge friends and family members of inmates (the "senders") for "services rendered." However, JPay also charges senders for monies it pays to the Department of Corrections in the form of a kickback or commission.

21.     According to the contract between JPay and the Louisiana Department of Public Safety & Corrections ("LA DOC"), the LA DOC receives "Commissions on Electronic Funds Transfers." Specifically, 15% of the fee charged to senders of Electronic Funds (i.e. family and friends of inmates) per each transaction is "to be remitted to the Department [LA DOC] as Commissions revenue."

22.     While a consumer may initiate a money transfer through JPay via the internet or via the phone, in neither case does JPay ever disclose that it is using the service fee to pay a commission.

23.     Additionally, JPay's website includes a page that purports to represent "JPay Terms of Service."

24.     Claimants were not affirmatively presented with, and did not review, the "JPay Terms of Service" prior to making electronic money transfers through JPay.

25.     Even assuming, *arguendo*, that JPay's Terms of Service ever became part of a contract between Claimants and JPay, JPay breached the terms of that contract.

26.     The Terms of Service state that "**In consideration for the use of the JPay Service, you agree to pay JPay a fee** for each Payment sent by you at the applicable rate then in effect (the "Service Fee"). All Service Fees are non-refundable" (emphasis added). However, the JPay "Service Fee" was, in part, <u>not</u> "consideration for use of the JPay Service," but was rather the extraction of monies that JPay used to pay kickbacks to state prison officials.

27.     JPay failed to disclose to its users that it was forcing them to pay the IL DOC and

LA DOC kickbacks that allowed JPay to charge them unconscionable fees in the first place.

28.     JPay pays these kickbacks to secure the business of a captive population so that it can charge exorbitant fees for electronic money transfer services.   JPay was not contractually authorized to charge consumers for this purpose.

**B.     JPay Forces Friends and Family Members to Use Its Expensive Electronic Money Transfer Services By Intentionally Slowing Down the Free Money Order Option**

29.     Prior to JPay taking control of money transfers in a given prison system, family members could simply send a paper money order to the prison, where it would be credited to the prisoner's account, free of charge.

30.     When JPay takes control of money transfers at a prison, it also takes control of the paper money order deposit system as well.  Consumers must send funds to JPay, at a "lockbox" located in Florida, and request that JPay add the funds to the prisoner's account.   But JPay intentionally slows down the low-cost paper money order system to force people to use its expensive electronic transfers.

31.     Historically, there is a clear slowdown in the paper money order system as soon as JPay takes over.  For example, in Virginia, complaints indicate that prior to JPay taking over the money transfer system, Virginia state prisons credited paper money orders to inmates' accounts in roughly *three days*. Today, paper money orders can take *more than a month* to reach an inmate's account—often giving friends and family members no choice but to use the JPay electronic transfer option.

32.     In an investigation, the Center for Public Integrity has found that, across the country, delays and other obstacles make the "free" money order transfer option inaccessible to many families. According to the investigation, more than a dozen families in five different states said that money orders have been credited much more slowly since JPay took over money

transfers at certain prisons.

33.     The manufactured delays leave consumers little choice but to use JPay's electronic money transfer services, which JPay touts as faster.

34.     JPay does not hide the fact that it intends to force consumers to use its expensive electronic money transfer option.  The founder of JPay admitted to the Center for Public Integrity that said JPay does "want people to convert from a money order customer to a digital customer, absolutely"—supposedly because electronic payments are more efficient. In actuality, JPay has a clear profit motive for "converting" consumers.

35.     According to the contract between JPay and the Louisiana Department of Corrections, "JPay's lockbox team maintains staggered shifts during a 12-hour business day. The team processes and submits the [paper money order] payments daily; decreasing the time it takes to reach the offender's account while eliminating mistaken payments."  The contract continues, "After the payment is scanned, verified and processed, the funds post to the offender's trust account the next morning in accordance with the Offender Banking System (OBS) interface."

36.     JPay violates this promise and does not process and post paper money orders to inmate accounts "the next morning".

37.     The Terms of Service (which Ms. Houston did not ever receive or review) are directly contrary to the agreement with the LA DOC and provide "All approved money orders will be processed within up to ten (10) business days following receipt by JPay."  As discussed above, JPay routinely does not process paper money orders within this time.

38.     According to the contract between JPay and the Illinois Department of Corrections, "JPay can collect, process and support US Postal money orders and cashier's checks

sent to Agency inmates.  Money orders are retrieved each business day from a JPay post office box, processed and added to the deposit file within 48 hours of receipt."

39.     JPay violates this promise and does not deposit money orders to inmate accounts "within 48 hours."

40.     Indeed, the Terms of Service (which Ms. Kobel did not ever receive or review) are directly contrary to the agreement with the DOC and provide "All approved money orders will be processed within up to ten (10) business days following receipt by JPay."  As discussed above, JPay routinely does not process money orders within this time.

**C.     JPay Forces Consumers to Use Its Expensive Money Transfer Services By Making the Free Money Order Option Hard To Use**

41.     Before JPay took over the Illinois prisons' money transfer services, friends and family members of inmates simply purchased money orders—usually for approximately $1—and mailed them to the prison.

42.     When JPay takes over a prison's money transfer system—as JPay did in Illinois prisons in approximately 2009 and Louisiana prisons in approximately 2011—it either eliminates the money order option altogether, or takes control of it and intentionally makes it difficult to use and slower than its electronic transfer services.

43.     Despite its obligation to provide a free money order option in certain states, JPay makes it difficult for consumers to discover that such an option even exists.  JPay also makes it difficult for consumers to discover that the option is free.  And JPay makes it procedurally difficult for consumers to avail themselves of the free money order transfer option.

44.     In short, JPay creates several new burdens and obstacles to use paper money orders after it takes control of a prison's money transfer system.

45.     Those seeking to avoid the exorbitant electronic money transfer fees by sending a

money order must print and fill out a JPay provided form, then mail that form to Florida—as opposed to simply sending a money order to the prison as was formerly possible.

46.     The instructions on the form are dwarfed by large print urging consumers to "Put down your pen! Put away your car keys!" because "There's a faster way to send money, go to JPay.com and sign up now!"

47.     In contrast, the money order deposit form says in almost illegible tiny print that the money order option is free—and this is the only place JPay informs consumers of this fact:

 Stay connected.

# Money Order Deposit Form

## HOW TO

### SEND A MONEY ORDER

 Detach and complete the bottom portion of this form in blue or black ink

 Make the money order payable to JPay
We recommend using US Postal Money Orders

 Place the money order and the Money Order Deposit Form in an envelope

 Mail to: JPay, PO Box 260250, Hollywood, FL 33026

### Make sure to...

- Write clearly on the form to avoid delays processing the money order
- Not include any letters or notes with your payment because these will be discarded
- Verify that your loved one's name and ID are entered correctly on the Money Order Deposit Form

There is no fee for sending money via money order

Visit JPay.com/LegalAgreementsOut.aspx for Terms & Conditions. A JPay account is not needed to send money orders. Call 800-574-5729 if you need more information or assistance completing this form

## —DID YOU **KNOW?**—

Money orders can take days to mail and process?

### There's a Better Way

Send money without a money order – and get the funds there the next day!*

 **www.JPay.com**
Sign up for your free account today

 **JPay Mobile**
Free mobile app for Android and iPhone

 **800-574-5729**
Toll-free phone number, 24/7

**In-Person/Cash**
MoneyGram® locations, including CVS & Walmart (Receive code 7364)

*Some facilities do not process on holidays and weekends. Delivery timing subject to depositor verification

---

 # Money Order Deposit Form

ALL FIELDS REQUIRED

**Mail to:** JPay, PO Box 260250, Hollywood, FL 33026

**Money Order Amount** – maximum $999.99

$

**Sender's Address**

**Inmate's ID**          **Inmate's State**

I L

**Inmate's Full Name**

City

State          Zip

Email

**Your First Name**          **Your Phone Number**

**Your Last Name**

**D.     JPay Forces People to Use Its Expensive Money Transfer Services with Deceptive Marketing Representations, Including Hiding Fact that Money Transfers are Free**

48.     JPay is required to offer free money orders, pursuant to its contract with the Illinois Department of Corrections, the Louisiana Department of Corrections, and other states' corrections systems.  But JPay uses marketing misrepresentations to denigrate the very free money order option its contracts with Illinois and other states require it to provide.

49.     JPay fails to present transfer options other than the JPay electronic transfer services equally.

50.     JPay does not adequately disclose that consumers may elect to send money to inmates for free via money orders.

51.     For the few consumers that are able to determine a free money order option exists, JPay ensures those consumers are faced with severe disincentives against using that option—in the form of manufactured money transfer delays.

52.     For example, JPay has promised the state of Illinois and the state of Louisiana to provide a fast, free money order option, but JPay conceals this fact from consumers.  In fact, it spends the entirety of its marketing efforts convincing consumers that money orders should be avoided at all costs:



53.     The above marketing representation is deceptive for because, for one, it

misrepresents JPay's contractual promise to Illinois, Louisiana, and other states.  By reading the ad, a consumer could not know that a money order was a free and feasible option to transfer funds to an inmate.

54.     Moreover, each of the bad outcomes reflected in the advertisement are completely *within the control of JPay*, including lateness of funds delivery and the "nightmare" process of completing a money order.  JPay thus strikes fear into the heart of consumers by exploiting its own poor performance and misconduct.

55.     Consumers are deceived into believing that they had no choice but to use JPay's expensive electronic money transfer services.

56.     In the form of website representations and marketing representations—including posters—disseminated at prisons, JPay represents to consumers that their money transfers will reach inmates significantly faster if they choose the JPay electronic transfer option and that their transfers would be delayed if they did *not* use that option.

57.     However, as discussed above, a transfer would be "delayed" only because JPay has designed its system to make money order processing more time-consuming and because JPay intentionally delays processing of money orders.

58.     Because inmates need money quickly—often for survival—JPay coerces family members to use JPay electronic transfer services in order to give inmates immediate access to their funds.

59.     JPay exploits the slowness of the free money order option (a slowness it manufactures) in its marketing and other communications.

60.     Indeed, when a consumer clicks the money order transfer link on JPay's website, the following page appears, urging consumers <u>not</u> to use money orders, nowhere stating that

money orders are a fast and free money transfer option (but for JPay's intentional interference), and nowhere providing a fair comparison of the costs and benefits of the money transfer options:



61.     JPay's tactics are extraordinarily successful.  According to the Center for Public Integrity, one former marketing director for the company lists as a key accomplishment on his LinkedIn profile that he "Converted 78 percent" of money order users to online users, boosting the company's annual revenue by $985,000.

62.     In Pennsylvania, another state that used to process money orders quickly for free, but where JPay now forces consumers to process money orders via a "lockbox" in Florida, the number of money orders plunged by *two-thirds* in the first two months after JPay took over payments.

63.     In Missouri, the state prison system processed, for free, 30,000 money orders a month before JPay took over money transfer services.   Now, JPay processes only 1,000 free

money orders per month.

64.     JPay then charges family members and friends unconscionable and excessive electronic money transfer fees.

**E.     JPay's Electronic Money Transfer Fees are Exorbitant, as Other Companies Provide Similar Prison Services for a Fraction of the Cost**

65.     Other companies provide similar prison money transfer services for far less.

66.     NIC Inc., a JPay competitor, charges a flat fee of $2.40 in Maine to send money to inmates.

67.     Until recently, Arkansas charged merely 5 percent to send money through the state's own Web portal.

**F.     Claimant Cynthia Kobel's Experience**

68.     While Ms. Kobel does not have a relative in prison, for years she has sent funds to Illinois prisoners as an act of charity.

69.     For approximately 14 years, and continuing until 2013, Ms. Kobel sent funds to prisoners in Illinois state prisons using money orders.   She spent approximately $1 per transaction, regardless of transaction amount.

70.     On or about January 2013, Ms. Kobel began to send funds to prisoners at Menard and Stateville Prisons. Ms. Kobel used JPay's electronic transfer services to send these funds, and understood herself to have no other reasonable option to send funds.

71.     The inmates to whom Ms. Kobel sends funds told her that they had received notice of JPay taking over money transfer services in Illinois prisons via a newsletter and other marketing materials.

72.     Ms. Kobel believe she had no choice but to use JPay electronic money transfer services because these services were marketed as the cheapest and most time-efficient option.

73.     By speaking to family members of inmates, Ms. Kobel came to understand that the money order transfer times had become exponentially lengthier, since friends and family members were deprived of the option of sending a money order through the post office, bank, or institution not affiliated with JPay.  This extreme slow-down was a well-known fact among inmates' friends and family members.  As such, Ms. Kobel, along with thousands of other inmates' friends and family members, was forced to begin using JPay electronic money transfer services if she wanted funds to arrive in anything approaching a timely fashion.

74.     Because Ms. Kobel was forced to begin using JPay electronic money transfer services, her cost for sending her charitable contributions soared.  Rather than approximately $1 per transfer, Ms. Kobel now faced higher charges for money transfers to Menard and Stateville.

75.     At least 10 times a year, Ms. Kobel sends inmates $50 to $100 dollars online, resulting in $7.95-per-transaction fees from JPay.

76.     A portion of each of these transaction fees was used by JPay to pay a commission to the Illinois Department of Corrections.  Ms. Kobel was never informed by JPay that it was using her money to pay a kickback to the Illinois Department of Corrections.

77.     Ms. Kobel would not have used JPay electronic money transfer services if JPay had not made free money order transfers burdensome and untimely.

78.     Ms. Kobel would not have used JPay electronic money transfer services if she had known a portion of the high transfer fees was used by JPay to pay a commission to the Illinois Department of Corrections, a kickback which JPay paid to win the business of the captive Illinois prison population for electronic money transfers.  Moreover, if given the option, Ms. Kobel would not have paid the 50-cent portion of the transfer fee that was ultimately paid to the DOC in the form of an "incentive payment."

**G.      Claimant Shalanda Houston's Experience**

79.      Ms. Houston has been sending funds to her husband for years, who is currently incarcerated at David Wade Correctional Center in Louisiana, in order to cover his legal fees and other expenses.

80.      For approximately 12 years, and continuing to 2012, Ms. Houston sent funds to her husband in Louisiana state prison using paper money orders.  She spent approximately $1 per transaction, regardless of the transaction amount.

81.      On or about August of 2012, Ms. Houston began to send funds to her husband at David Wade Correctional Facility.  Ms. Houston used JPay's electronic transfer services to send these funds, and understood herself to have no other reasonable option to send funds.

82.      Ms. Houston's husband told her that he had received notice of JPay taking over money transfer services in Louisiana prisons via a newsletter and other marketing materials.

83.      Ms. Houston believe she had no choice but to use JPay money transfer services because these services were marketed as the only time-efficient option.

84.      By speaking to family members of inmates, Ms. Houston came to understand that the money order transfer times had become exponentially lengthier, since friends and family members were deprived of the option of sending a money order through the post office, bank, or institution not affiliated with JPay.  This extreme slow-down was a well-known fact among inmates' friends and family members.  As such, Ms. Houston, along with thousands of other inmates' friends and family members, was forced to begin using JPay electronic money transfer services if she wanted funds to arrive in anything approaching a timely fashion.

85.      Because Ms. Houston was forced to begin using JPay electronic money transfer services, the cost to financially support her husband soared.  Rather than approximately $1 per transfer, Ms. Houston now faced higher charges for money transfers to David Wade.

86.     Ms. Houston sends her husband almost $1000 dollars per month online, resulting in more than $20 in monthly transaction fees (including the hidden kickbacks) from JPay.  JPay policy prohibits sending more than $300 in one transaction, so Ms. Houston is forced to make several transactions in order to complete her monthly contribution, thereby resulting in more transfer fees and kickbacks.

87.     Ms. Houston would not have used JPay electronic money transfer services if JPay had not made free money order transfers burdensome and untimely.

88.     Ms. Houston would not have used JPay electronic money transfer services if she had known a portion of the high transfer fees was used by JPay to pay a commission to the Louisiana Department of Corrections, a kickback which JPay paid to win the business of the captive Louisiana prison population for electronic money transfers.

## IV.     CLASS ACTION ALLEGATIONS

89.     <u>Description of the Class</u>:  Claimants bring this class action on behalf of themselves and a Class defined as follows:

> All natural persons who paid a fee to JPay for electronic money transfer services and who agreed to arbitrate their claims with Jpay (the "Class").

90.     Excluded from the Class are JPay's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, judicial officer or arbiter presiding over this matter and the members of their immediate families and judicial staffs.

91.     <u>Numerosity</u>:  The proposed Class is so numerous that individual joinder of all members is impracticable.

92.     <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of

law and fact common to Claimants and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of law and fact include:

     a.  Whether JPay's money transfer services are unfairly and exorbitantly priced;

     b.  Whether JPay intentionally slows down its free money order option;

     c.  Whether JPay hides the fact that free money transfers are available;

     d.  Whether JPay used proceeds from money transfer fees to pay undisclosed kickbacks to the Illinois Department of Corrections, the Louisiana Department of Corrections, and/or other prison agencies;

     e.  Whether JPay engaged in unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce;

     f.  Whether JPay breached its contracts with Claimants and the Class;

     g.  Whether JPay breached the implied covenant of good faith and fair dealing with Claimants and the Class;

     h.  Whether JPay was unjustly enriched through its dealings with Claimants and the Class;

     i.  Whether JPay acted unconscionably through its dealings with Claimants and the Class;

     j.  Whether JPay should be ordered to pay actual damages to Claimants and the other members of the Class;

     k.  Whether JPay should be ordered to pay punitive damages, as allowable by law, to Claimants and the other members of the Class;

     l.  Whether JPay should be ordered to pay statutory damages, as provided by the Florida Deceptive and Unfair Trade Practices Act, to Claimants and the other members of the Class; and

     m.  Whether JPay should be ordered to pay attorneys' fees and costs.

93.   <u>Typicality</u>:  Claimants' claims are typical of the claims of the members of the Class.  Claimants and all members of the Class have been similarly affected by the actions of JPay.

94.     <u>Adequacy of Representation</u>:  Claimants will fairly and adequately represent and protect the interests of the Class.  Claimants has retained counsel with substantial experience in prosecuting complex and class action litigation.  Claimants and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

95.     <u>Superiority of Class Action</u>:  Claimants and the members of the Class suffered, and will continue to suffer, harm as a result of JPay's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.

**<u>FIRST CLAIM FOR RELIEF</u>**
**<u>Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*)</u>**
**<u>(On behalf of the Class)</u>**

96.     Claimants re-allege and incorporate by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein.

97.     The Florida Deceptive and Unfair Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.  Unconscionable acts or practices include, but are not limited to, the use of market power to extract contract concessions from parties to a transaction; withholding information that could affect a consumer's decision to enter into a transaction; intentionally stalling or slowly performing contract obligations; and violations of any statute, rule, regulation, or ordinance that prohibits unconscionable acts or practices.

98.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

99.     JPay engaged in "trade or commerce" within the definition of FDUTPA, by engaging in "advertising, soliciting, providing, offering, or distributing, whether by sale . . . or otherwise, of any good or service . . . or any other article, commodity, or thing of value." Fla. Stat. § 501.203(8).  More specifically, as alleged above, JPay, from its Florida headquarters, sold and provided electronic money transfer services to Claimants and members of the Class.

100.    Claimants are "consumers" as defined by Fla. Stat. § 501.203(7) because Claimants each qualify as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination."  Thus, Claimants are entitled to seek the underlying relief.

101.    The JPay Terms of Service contain a Florida choice of law provision.

102.    JPay engaged in deceptive acts or unfair and/or unconscionable practices by using deceptive marketing representations and omissions to force consumers away from free money order transfer services and toward exorbitantly-priced JPay electronic money transfer services.

103.    JPay also engaged in deceptive acts or unfair and/or unconscionable practices by making free money order transfers burdensome and difficult to use—even though it was required to provide such free services pursuant to contracts with Illinois, Louisiana, and other states—to force consumers away from free money order transfer services and toward exorbitantly-priced JPay electronic money transfer services.

104.    JPay also engaged in deceptive acts or unfair and/or unconscionable practices by intentionally slowing down free money order transfers, which it is required to provide pursuant

to contracts with Illinois, Louisiana, and other states, to force consumers away from free money order transfer services and toward exorbitantly-priced JPay electronic money transfer services.

105.    JPay has paid a substantial portion of electronic money transfer fees to prison officials in the form or commissions or kickbacks—a scheme both unfair and unconscionable to consumers and one that deceived them into believing that they were paying for JPay services when, in fact, they paying for kickbacks.

106.    Through its unfair, unconscionable and deceptive practices, JPay caused Claimants and the Class to pay exorbitant fees that they otherwise would not have, but for JPay's wrongful acts.

107.    FDUTPA specifically provides for injunctive relief related to alleged unfair, deceptive, and unconscionable practices.  Without an injunction requiring JPay to disclose its kickbacks to consumers and preventing JPay from making its deceptive marketing representations and omissions detailed herein, consumers, including Claimants and the Class, will continue to be deceived.  Therefore, pursuant to Fla. Stat. § 501.211(1), Claimants seek a declaration stating that JPay's deceptive, unfair, and unconscionable conduct has violated and continues to violate FDUTPA and seek injunctive relief regarding JPay's past and continuing deceptive, unfair, and unconscionable conduct.

108.    Claimants and the Class suffered actual damages in the form of exorbitant fees paid to JPay that they would not have paid had JPay not forced them away from free money order transfer services.

109.    Pursuant to Fla. Stat. § 501.211(2), Claimants are authorized to bring a civil action to recover Claimants' actual damages, plus attorneys' fees and costs, as provided by Fla. Stat. § 501.2105.

## SECOND CLAIM FOR RELIEF
### Breach of Contract, Including Covenant of Good Faith and Fair Dealing
### (On behalf of the Class)

110.    Claimants re-allege and incorporate by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein.

111.    Claimants and JPay have contracted for electronic money transfer services, and an express or implied contract exists between the parties for this service.

112.    JPay violated, and continues to violate, the contract it has with consumers when it uses electronic money transfer fees to pay commissions to state prison officials.

113.    Under the laws of the states where JPay does business, good faith is an element of every contract.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

114.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

115.    JPay violated the covenant of good faith and fair dealing when it assessed service fees for electronic money transfers that were used, in part, to pay kickbacks and commissions to

prisons and prison officials.

116.     JPay willfully engaged in the foregoing conduct in bad faith, for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Claimants and other members of the Class.  These practices were not authorized by the contract, were not within JPay's discretion under the contract, and were outside the reasonable expectations of Claimants and the Class members.

117.     Claimants and members of the Class have performed all, or substantially all, of the obligations imposed on them.

118.     Claimants and members of the Class have sustained damages as a result of JPay's breach of the covenant of good faith and fair dealing.

119.     Claimants and members of the Class  have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
#### Unjust Enrichment
#### (On behalf of the Class)

120.      Claimants re-allege and incorporate by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

121.     Claimants, on behalf of themselves and the Class, assert a common law claim for unjust enrichment.

122.     By means of JPay's wrongful conduct alleged herein, JPay engaged in a scheme whereby it paid a substantial portion of electronic money transfer fees to prison officials in the form or commissions or kickbacks—a scheme that was unfair, unconscionable, and oppressive.

123.     JPay uses deceptive marketing representations and omissions to force consumers away from free money order transfer services and toward exorbitant JPay electronic money

transfer services.

124.     JPay intentionally slows down free money order transfers, which it is required to provide pursuant to contracts with Illinois, Louisiana, and other states, to force consumers away from free money order transfer services and toward exorbitant JPay electronic money transfer services.

125.     JPay knowingly received and retained wrongful benefits and funds from Claimants and members of the Class.  In so doing, JPay acted with conscious disregard for the rights of Claimants and members of the Class.

126.     As a result of JPay's wrongful conduct as alleged herein, JPay has been unjustly enriched at the expense of, and to the detriment of, Claimants and members of the Class.

127.     JPay's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

128.     Under the common law doctrine of unjust enrichment, it is inequitable for JPay to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of exorbitant transfer fees on Claimants and members of the Class in an unfair, unconscionable, and oppressive manner.  JPay's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

129.     The financial benefits derived by JPay rightfully belong to Claimants and members of the Class.  JPay should be compelled to disgorge in a common fund for the benefit of Claimants and members of the Class all wrongful or inequitable proceeds received by it.  A constructive trust should be imposed upon all wrongful or inequitable sums received by JPay traceable to Claimants and the members of the Class.

130.     Claimants and members of the Class have no adequate remedy at law.

<u>FOURTH CLAIM FOR RELIEF</u>
<u>Unconscionability</u>
<u>(On behalf of the Class)</u>

131.    Claimants re-allege and incorporate by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

132.    JPay's policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

  a. JPay employs deceptive marketing representations and omissions to force consumers away from free money order transfer services and toward exorbitantly-priced JPay electronic money transfer services.

  b. JPay intentionally slows down free money order transfers, which it is required to provide pursuant to contracts with Illinois, Louisiana, and other states, to force consumers away from free money order transfer services and toward exorbitantly-priced JPay electronic money transfer services.

  c. JPay assesses service fees for electronic money transfers that were used, in part, to pay kickbacks and commissions to prisons and prison officials.

133.    Considering the great business acumen and experience of JPay in relation to Claimants and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract terms at issue, the oppressiveness of the contract terms, the commercial unreasonableness of the contract terms, the purpose and effect of the contract terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

134.    Claimants and the Class members have suffered damages as a result of JPay's unconscionable policies and practices as alleged herein.

## V. REQUEST FOR RELIEF

WHEREFORE, Claimants, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Arbitrator enter judgment in their favor

and against JPay, as follows:

1.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Claimants as Class Representatives and appointing the undersigned counsel as Class Counsel for the Class;

2.      Ordering JPay to pay actual damages to Claimants and the other members of the Class;

3.      Ordering JPay to pay punitive damages, as allowable by law, to Claimants and the other members of the Class;

4.      Ordering JPay to pay statutory damages, as provided by the Florida Deceptive and Unfair Trade Practices Act, to Claimants and the other members of the Class;

5.      Awarding declaratory and injunctive relief as permitted by law;

6.      Ordering JPay to pay attorneys' fees  costs and expenses; and

7.      All other relief the Arbitrator deems necessary.


Dated: October 16, 2015                                    Respectfully submitted,


                                                           /s/ *John A. Yanchunis*
                                                           John A. Yanchunis
                                                           Florida Bar No. 324681
                                                           Rachel L. Soffin
                                                           Florida Bar No. 18054
                                                           **MORGAN & MORGAN**
                                                           **COMPLEX LITIGATION**
                                                           **GROUP**
                                                           One Tampa City Center
                                                           201 North Franklin Street, 7th Floor
                                                           Tampa, FL 33602
                                                           Tel: (813) 314-6484
                                                           Fax: (813) 222-2406
                                                           jyanchunis@forthepeople.com
                                                           rsoffin@forthepeople.com

Hassan A. Zavareei
Andrea R. Gold
Jeffrey D. Kaliel
Andrew J. Silver
**TYCKO & ZAVAREEI LLP**
2000 L Street NW
Suite 808
Washington, DC 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com
jkaliel@tzlegal.com
asilver@tzlegal.com